UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

---

WAYNE MEETZ, individually and on behalf
of all others similarly situated,

     Plaintiffs,

             Case No. 16-cv-1313

  v.

WISCONSIN HOSPITALITY GROUP, LLC
and PH HOSPITALITY GROUP, LLC d/b/a
PIZZA HUT,

     Defendant.

---

**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED NOTICE**

---

## INTRODUCTION

  Defendants Wisconsin Hospitality Group, LLC and PH Hospitality Group, LLC d/b/a Pizza Hut (collectively "WHG") own and operate seventy-three Pizza Hut store locations throughout Wisconsin. Plaintiff Wayne Meetz worked as a delivery driver for WHG for approximately eleven months in 2015. As a delivery driver, Meetz earned $5.25 per hour plus tips. If a delivery driver does not claim enough in tips to meet the minimum wage of $7.25 during any given pay period, WHG makes up the difference to ensure compliance with the minimum wage requirements of the federal Fair Labor Standards Act ("FLSA"). WHG, however, never had to pay Meetz a make-up amount to meet the FLSA minimum wage. WHG also paid Meetz one dollar per delivery as a reimbursement for the use of his vehicle while delivering pizza for WHG. Based on what Meetz claimed in tips while employed by WHG, his average hourly rate was $11.17 – nearly four dollars more than the minimum wage. WHG also paid Meetz $2,373.00 in reimbursements for the 2,373 deliveries that he made.

Meetz now claims that WHG violated state and federal wage and hour law by paying him a flat, per-delivery vehicle reimbursement that Meetz alleges was inadequate to compensate him for his actual vehicle expenses and, therefore, took his hourly wage below the minimum required by the FLSA. Before the Court is Meetz's motion to conditionally certify a class of WHG delivery drivers on his FLSA claim.

While some cases warrant conditional certification under the FLSA, this is not one. To obtain conditional certification, Meetz must demonstrate that he and opt-in plaintiffs were victims of a common policy or plan that violated the law. Meetz's claim is based on the conclusory allegation that WHG's per-delivery vehicle reimbursement practice resulted in delivery drivers being inadequately reimbursed for actual vehicle expenses such that their hourly wage fell below the statutory minimum. Under the FLSA's implementing regulations, however, WHG need only reasonably approximate an employee's business-related expenses when reimbursing its drivers for those expenses. WHG engaged in such an approximation and Meetz's motion fails to demonstrate that WHG's analysis was unreasonable. Nor has Meetz demonstrated that WHG's reimbursement approximation *actually resulted* in Meetz earning less than the minimum wage mandated by FLSA. For those reasons, Meetz's motion fails.

Moreover, WHG's wage and reimbursement policies vary by location making a collective action inappropriate in this case. Meetz places all his eggs in the "lenient standard" basket typically applied at the conditional certification stage. However, substantial discovery has occurred in this case. WHG has responded to two sets of requests for production of documents, produced over 3,400 pages of information – including a complete list of delivery drivers employed by WHG since September 30, 2013, responded to interrogatories and produced three corporate representatives to testify on ***seventy-two*** different topics that Meetz set forth in his Rule 30(b)(6)

2

deposition notice. The record before the Court includes portions of that testimony, 48 declarations from current and former delivery drivers proffered by plaintiffs with their motion, WHG's wage and hour policies, and information related to WHG's payroll records. Accordingly, a heightened standard applies whereby Meetz's motion is subject to the scrutiny normally applied at the class certification stage, i.e. – Are there disparate factual and employment settings for individual plaintiffs? Are there various individualized defenses available to defendants? Are there fairness and procedural considerations disfavoring certification? Here, a review of the substantial record before the Court demonstrates that the answer to each of those three questions is a resounding, yes. WHG delivery drivers performed different tasks; earned different base wages; drove different distances in different types of vehicles; and were reimbursed at different rates for use of their personal vehicles. Meetz's case is not appropriate for collective resolution and, therefore, his motion should be denied.

## STATEMENT OF FACTS

### A. WHG Employs Delivery Drivers at Each of its Pizza Hut Locations.

WHG operates seventy-three Pizza Hut stores located primarily in urban areas across Wisconsin. (Decl. of Brian Spahn ("Spahn Decl.") ¶ 2, Ex. A (Dep. of June Weiss, hereinafter "Weiss Dep.") at 31:9-13.) WHG currently employs approximately 550 delivery drivers who, on average, spend approximately 54% of their time delivering pizza and other food items to customers' homes and workplaces. (Decl. of June Weiss ("Weiss Decl.") ¶¶ 6-7.) The remainder of their time may be spent working as hosts and hostesses, supervising other employees, preparing pizzas, or performing other work related to the operation of the Pizza Hut location. (Weiss Decl. ¶ 8.) Not surprisingly, the amount of time a delivery driver dedicates to delivering pizza and other food varies by individual, location, and the particular store's needs. (Weiss Decl. ¶ 10.)

3

To ensure freshness and quality of its pizza and other food items, WHG geographically restricts the delivery area around each Pizza Hut location so that food can be delivered within 24 minutes of its preparation, anticipating that delivery drivers will make multiple deliveries each time they leave the store. (Spahn Decl. ¶ 3, Ex. B (Dep. of Jason Westhoff, hereinafter "Westhoff Dep.") at 45:11-15; Weiss Decl. ¶ 12) WHG's Pizza Hut locations are strategically placed in densely populated areas to ensure that delivery distances and times are short. (Westhoff Dep. at 46:11-47:8; Weiss Decl. ¶¶ 12-13.) Delivery areas are limited so that deliveries can be completed within 8 to 12 minutes of production. (Weiss Decl. ¶ 14; *see also* Westhoff Dep. at 47:15-48:17.) The strategic placement of WHG's Pizza Hut stores ensures that deliveries generally occur within 8-12 minutes of production. (Weiss Decl. ¶ 15.)

### B. Deliver Drivers' Compensation Varies Between Pizza Hut Location and Based on Work Performed.

WHG compensates its delivery drivers based on the actual work they perform. Time spent delivering food is compensated at a delivery-based hourly wage rate, which varies based on store location. (Weiss Dep. at 47:21-48:5, 61:2-8; Weiss Decl. ¶ 16.) The applicable delivery-based hourly wage WHG pays its delivery drivers ranges from $5.25 to $9.25 per hour.[1] (Weiss Dep. at 63:23-25, 64:1-25, 65:1-25; Westhoff Dep. at 24:1-3, 16-22.) On top of the delivery-based wage, delivery drivers also receive tips from Pizza Hut customers. (Weiss Dep at 70:13-16.) Tips are not considered part of the reimbursement paid to delivery drivers for the cost of operating a vehicle. (Westhoff Dep. at 26:3-5.) If a delivery driver's wages ever fall below $7.25 as a result of the driver reporting inadequate tip income, WHG makes up that pay to ensure compliance with the FLSA. (Weiss Dep. at 84:3-7.)

---

[1] A Milwaukee area store, Midtown, paid its employees $9.25 an hour; however that store closed effective February 22, 2016. (Weiss Dep. at 63:23-25, 64:1-25, 65:1-25; Westhoff Dep. at 24:1-3, 16-22; Weiss Decl. ¶ 17.) The Midtown employees who remained with WHG continue to receive the $9.25 wage rate. (*Id.*)

When not delivering food, delivery drivers are paid a base wage rate that is at or above the minimum wage set by federal and state law. The applicable base wage for non-delivery work also varies from store to store and ranges from a minimum of $7.25 up to $8.00 per hour. (Weiss Dep. at 70:2-10.)

### C. WHG Reasonably Approximated Vehicle Expenses for Purposes of Reimbursing Its Delivery Drivers.

Delivery drivers are responsible for providing and using their own vehicle to deliver pizza and other food items to Pizza Hut's customers. Their vehicles must be insured, as required by Wisconsin law, and be in good working order for the drivers' own safety.

For efficiency purposes and to reduce overall costs, whenever possible, Pizza Hut stores have their delivery drivers make *multiple deliveries* each time they leave the store. (Weiss Decl. ¶ 19.) When the delivery driver leaves the store, they are considered on a "Run." (*Id.*) In fact, delivery drivers typically make two deliveries per Run; however, they may make up to four deliveries each Run and at other times, just one delivery on a Run. (*Id.*) WHG reimburses its drivers at least $1.00 per *delivery* (as opposed to per Run). (*Id.*) As a result, delivery drivers will receive multiple reimbursements when they make multiple deliveries on a Run. (*Id.*)

In 2009, WHG's Chief Financial Officer ("CFO") analyzed the vehicle reimbursement rate to ensure that it was competitive and reasonably approximated the delivery drivers' vehicle expenses. (Westhoff Dep. at 27:12-14, 68:2-22.) WHG employed a conservative approach to ensure that the calculation would benefit delivery drivers. (Westhoff Dep. at 48:1-4.) For example, WHG's calculation assumed that its delivery drivers' vehicles only obtained a gas mileage rate of 10 miles per gallon, despite the fact that even the least fuel efficient vehicles, *e.g.*, Hummers, average at least 12 to 16 miles per gallon. (Westhoff Dep. at 52:21-54:5, 54:9-55:25, 57:9-15.) WHG also inflated the mileage estimate approximating that delivery drivers drove at

5

least 856.8 miles per week.[2]  (Spahn Decl. ¶ 4, Ex. C.)  Finally, WHG estimated fuel expenses

based on the average gas price in Wisconsin.[3]  (*Id.*)

WHG conservatively estimated that its delivery drivers would make 1.5 deliveries per Run.

(*Id.*; Westhoff Dep. at 63:6-9.)  Adding in expenses for maintenance, fuel, and parts, WHG

approximated that its delivery drivers incurred roughly $1.30 in vehicle expenses per *Run*.

(Westhoff Dep. at 63:12-15.)  Based on these conservative calculations, WHG determined that

$1.00 per *delivery* (or, for example, $1.50 for 1.5 deliveries on a Run) was a reasonable

approximation of its delivery drivers' expenses.  (Westhoff Dep. at 136:10-16.)

WHG then compared its $1.00 per-delivery reimbursement rate against the rate provided by

Runzheimer International, Inc. ("Runzheimer").  (Westhoff Dep. at 65:4-13.)  Runzheimer is an

independent, nationally recognized expert in automobile reimbursement.  *Clark v. Modern Group

Ltd.*, CIV. A. 91-5391, 1992 WL 332260, at *1 (E.D. Pa. Nov. 4, 1992), aff'd, 9 F.3d 321 (3d Cir.

1993).  Runzheimer advised that the appropriate reimbursement rate to compensate drivers for

each *Run* was $0.88, which was $0.62 less than the rate paid by WHG for its average driver Run.

(Spahn Decl. ¶ 4, Ex. C.; Westhoff Dep. at 65:4-12.)  A primary reason WHG decided to continue

to pay the higher $1.00 per-delivery reimbursement rate was to attract and retain delivery drivers.

(Westhoff Dep. at 136:10-16.)

---

[2] The declarations submitted by Plaintiff in support of his motion demonstrate that the putative class plaintiffs drove, on average significantly less than 856.8 miles per week.  According to the few plaintiffs who have provided discovery responses to date, they drove on average only 471.3 miles per week. (Spahn Decl. ¶ 5, Ex. D.)

[3] Throughout 2014-2016, gas prices fell well below $2.60 a gallon.  As Mr. Westhoff pointed out during his deposition, the numbers relied upon by the plaintiffs are based on the price of gas in the "Midwest" which includes locations such as northern Illinois.  Gas prices in other states are often significantly higher than in Wisconsin.  Mr. Westhoff based his calculation on the cost of gas in the Milwaukee area, which is higher than in other parts of Wisconsin, yet lower than the Midwest generally.  (Westhoff Dep. at 191:7-25, 192:1-25.)

In 2011, WHG's CFO revisited the reimbursement rate paid to delivery drivers. Based on information pulled from WHG's system along with data provided by Runzheimer, WHG determined that the reimbursement rate continued to adequately cover its delivery drivers' expenses. (Westhoff Dep. at 68:2-22.) Between 2014 and 2016, gas prices fell drastically, at times below $2.00 a gallon and remained below $2.60 for most months of the year. Because WHG's analysis was conducted when gas prices were higher, WHG reasonably believed that its $1.00 per-delivery reimbursement rate continued to be a reasonable approximation of delivery drivers' vehicle expenses.

By 2013, multiple base wage and reimbursement rates were being utilized by different WHG-owned stores. (Weiss Decl. ¶ 16.) Some stores raised reimbursement rates due to serving a larger delivery area. Other stores increased reimbursement rates to attract drivers. (Weiss Dep. at 47:21-48:5, 64:20-65:13.) Some individual store managers even increased the reimbursement rate without notifying WHG of the change. (Weiss Dep. 108:5-20.) Despite the variations, however, the delivery reimbursement rate never fell below $1.00 per delivery. (Weiss Dep. at 107:18-108:8.)

From time to time, WHG has reevaluated its delivery reimbursement methods and discussed the reimbursement with its delivery drivers. (Weiss Dep. at 160:18-162:10.) At one point, WHG contemplated providing its delivery drivers a per mile reimbursement based on the IRS tax rate. (*Id.*) WHG's Human Resource Director approached several delivery drivers to determine their thoughts on the proposal. (*Id.*) The delivery drivers with whom she spoke rejected the proposal and stated that such an approach would result in drivers receiving less money to cover their vehicle expenses. (*Id.*)

7

**D.     A Review of Wayne Meetz's Average Wage Rate Demonstrates That He Was Compensated Well In Excess of the Minimum Wage.**

Wayne Meetz was employed by WHG from January 26, 2015 to November 19, 2015. (Mar. 9, 2017 Decl. of Wayne Meetz ("Meetz Decl.") ¶¶ 2-3.)  He worked out of the Oneida, Wisconsin Pizza Hut store.  (*Id.*)  During that time, Meetz logged 658.2 hours delivering pizza at an hourly rate of $5.25, which totals $3,455.71 ($3.12 an hour more than the tipped employee minimum wage).[4] (Weiss Decl. ¶ 22.)  He also reported earning $3,899.61 in tips, for an average of at least $5.92 an hour.  Meetz always reported receiving tips sufficient to cover the difference between the tipped employee minimum wage ($2.13) and the federal minimum wage ($7.25) for the time he worked for WHG.  (Weiss Decl. ¶¶ 23, 27.)  Therefore, Meetz's total wage and tips equaled $7,355.16 – **an *average hourly rate of $11.17***:

- 658.2 hours * $5.25 =          $3,455.55
- $3,899.61 (tips) / 658.2 =     $5.92 average
- $3,455.55 + $3,899.61 =        $7,355.16
- $7,355.16 / 658.2 =            $11.17 average hourly wage

(*See* Weiss Decl. ¶¶ 24, 26.)

In addition, WHG paid Meetz $2,373.00 in reimbursements for the 2,373 deliveries that he made.  (Weiss Decl. ¶ 25.)  While Meetz attached a declaration to his motion indicating that he incurred vehicle expenses "including fuel, oil changes, brakes/ pads, axel[sic], tires, tire rotations, batteries, insurance, registration, and other items …" he has put forth no evidence that those expenses exceeded the amount he was reimbursed by WHG.

---

[4] Pursuant to the FLSA, the tipped employee minimum wage is $2.13.  *See* 29 C.F.R. § 531.59.

### E.     The Parties Have Engaged In Significant Discovery

Meetz filed this case on September 30, 2016.  Since that time, WHG has responded to two sets of written requests for production of documents, produced over 3,400 pages of information – including a complete list of delivery drivers employed by WHG since September 30, 2013 – responded to interrogatories, and produced three corporate representatives to testify on ***seventy-two*** different topics that Meetz identified in his Rule 30(b)(6) deposition notice.

As recently as March 24, 2017, nearly one-third of the opt-in plaintiffs filed *opt-out* requests.

## ARGUMENT

## I.     MEETZ FAILS TO MAKE A MODEST FACTUAL SHOWING THAT HE AND OPT-IN PLAINTIFFS WERE VICTIMS OF A COMMON POLICY THAT VIOLATED THE LAW.

Once a plaintiff files a FLSA claim, the district court has "managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way." *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 171 (1989).  Courts must limit conditional certification, however, to "appropriate cases" and "avoid the stirring up of litigation through unwarranted solicitation." *Freeman v. Wal-mart Stores, Inc.*, 256 F. Supp. 2d 941, 944 (W.D. Ark. 2003) (quotation marks and citation omitted).  As this Court has made clear, "[t]he critical inquiry in determining whether a court should exercise its discretion to authorize the sending of notice to potential plaintiffs is whether the representative plaintiff has shown that she is similarly situated to the potential class plaintiffs." *Adair v. Wisconsin Bell, Inc.*, No. 08-C-280, 2008 WL 4224360, at *2 (E.D. Wis. Sept. 11, 2008) (citing *Austin v. CUNA Mut. Ins. Soc'y*, 232 F.R.D. 601, 605 (W.D. Wis. 2006)).

This Court has adopted a two-stage analysis to determine whether employees are similarly situated such that the case may proceed as an opt-in collective action. *Id.* at *8.  During the first

9

step (conditional certification), the court must determine whether the plaintiff has demonstrated a "reasonable basis" for believing that she is similarly situated to potential class members. *Id*. at *3 (citation omitted). To obtain conditional certification, plaintiffs are required to make a factual showing to support their allegations. Importantly, "[a]lthough the burden [plaintiffs] bear in making a factual showing in support of conditional certification is, . . . 'fairly low,' the 'modest factual showing' standard 'is not a mere formality.'" *Id*. (citations omitted.) Courts in this district give a careful eye to plaintiffs' conditional certification motions and do not hesitate to deny the motions when the proof is missing. *See, e.g., id.* at *12 (denying motion for conditional certification); *see also Hadley v. Journal Broadcast Group, Inc.*, No. 11-C-147, 2012 WL 523752, at *5 (E.D. Wis. Feb. 16, 2012) (same).

The FLSA requires employers to pay a minimum wage per hour to employees "who in any workweek are engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 206(a). To establish a minimum wage violation under the FLSA, Meetz must demonstrate that he engaged in compensable activity within the meaning of the statute and that the wages received for that activity fell below minimum wage. 29 U.S.C. § 206(a); *see also, Barrentine v. Arkansas-Best Freight System, Inc.,* 750 F.2d 47 (8th Cir. 1984), *cert. denied,* 471 U.S. 1054 (1985). To obtain conditional certification, Meetz must also offer modest factual proof that he and opt-in plaintiffs were victims of a common policy or plan that violated the law. *Fosbinder-Bittord v. SSM Health Care of Wisconsin, Inc.,* Case No. 11-CV-592, 2013 WL 3287634, at *4 (W.D. Wis. Mar. 21, 2013). Meetz fails to satisfy this lenient standard.

Meetz's motion neither establishes that he ever was paid below the minimum wage nor offers any basis to believe that WHG's reimbursement policy violates the law. In fact, based on

10

what Meetz claimed in tips while employed by WHG, *his average hourly rate was $11.17*, which excludes the $2,373 he received in reimbursement payments for the use of his vehicle.

In the absence of facts supporting his (false) assertion that he was paid less than the minimum wage, Meetz argues that conditional certification is appropriate because WHG does not have accurate, contemporaneous driver expense records, did not calculate drivers' actual vehicle expenses, and did not utilize the IRS mileage deduction rate. The FLSA's implementing regulations, however, make clear that an employer is permitted to reasonably approximate an employee's business-related expenses when reimbursing employees for those expenses. *See Wass v. NPC Int'l, Inc.*, 688 F. Supp. 2d 1282, 1286 (D. Kan. 2010) ("[U]nder [29 C.F.R.] Section 778.217 of the regulations, an employer may reasonably approximate the amount of expenses in reimbursing an employee for expenses incurred for the benefit of the employer…" and noting 29 C.F.R. Section 778.217 is applicable to minimum wage calculations.). Here, WHG reasonably approximated delivery drivers' vehicle expenses when assessing its reimbursement policy.

In 2009, WHG analyzed the delivery reimbursement rate paid to delivery drivers to ensure the rate was competitive and that it adequately reimbursed their vehicle expenses. (Westhoff Dep. at 136:10-16.) In doing so, WHG made the following assumptions:

- Delivery drivers' vehicles only obtained a gas mileage rate of 10 miles per gallon (Westhoff Dep. at 52:21-54:5, 54:9-55:25, 57:9-15);

- Delivery drivers drove at least 856.8 miles per week (Spahn Decl., Ex. C);

- Gas costs incurred by delivery drivers equaled the average price of gas in Wisconsin at the time (Westhoff Dep. at 191:7-25, 192:1-25);

- Drivers made multiple deliveries for each Run, but WHG conservatively estimated drivers averged just 1.5 deliveries per run (Spahn Decl., Ex. C; Westhoff Dep. at 63:6-9); and

- Expenses for maintenance, fuel, and parts were included (Spahn Decl., Ex. C).

11

With all this, WHG approximated that the cost *per Run* averaged $1.30. (Westhoff Dep. at 63:12-15.) Therefore, WHG determined that the $1.00 *per delivery* (or $1.50 per average Run) was a reasonable approximation of its delivery drivers' expenses. (Westhoff Dep. at 136:10-16.)

WHG also compared its $1.00 per-delivery reimbursement rate against the rate provided by Runzheimer. Runzheimer's rate was $0.62 less than the rate paid by WHG for an average Run. (Westhoff Dep. at 65:4-12.) In 2011, WHG revisited the reimbursement rate paid to delivery drivers. Based on information pulled from WHG's system along with data provided by Runzheimer, WHG determined that the reimbursement rate continued to be a reasonable approximation of drivers' expenses. (Westhoff Dep. at 136:10-16.)

Before conditional certification may be granted, Meetz must prove that he is a victim of a WHG policy denying him the federal minimum wage, which requires allegations that he and the opt-in plaintiffs are similarly situated with the putative class. *Nuchell v. Cousings Submarines, Inc.,* Case No. 16-CV-232, 2017 WL 782443, at *2 (E.D. Wis. Feb. 28, 2017); *Stubbs v. McDonald's Corp*, 227 F.R.D. 661, 666 (D. Kan. 2004). Meetz offers nothing more than conclusory allegations that WHG's reimbursement policy violates the FLSA. Simply alleging that WHG failed to adequately reimburse delivery drivers for their automobile expenses is not enough to establish a violation of the FLSA.

Meetz devotes a significant portion of his brief to cherry-picking certain costs associated with operating a vehicle and then summarily concludes that WHG's per-delivery reimbursement fails to adequately reimburse those costs which necessarily constitutes a minimum wage violation. Determining whether WHG's per-delivery reimbursement might violate the FLSA, however, requires an individual analysis of a driver's pay rate and automobile expenses. Meetz provides no reasonable basis for the proposition that *an entire class of WHG drivers* incurred automobile

12

expenses that exceeded the reimbursement payments they each received from WHG – nor could he given the drivers' different cars, insurance rates, fuel efficiency, etc. Automobile expenses are unique to a driver. Meetz's conditional certification motion must be denied because the proof that he and opt-in plaintiffs were victims of a common policy or plan that violated the law is just not there. *See Adair*, 2008 WL 4224360, at \*12 (ruling that plaintiffs had not made a sufficient factual showing that they and the putative class members were similarly situated as victims of a common illegal policy at their employer.)

## II.      THE COURT SHOULD APPLY A HEIGHTEND STANDARD TO PLAINTIFF'S MOTION GIVEN THE SUBSTANTIAL DISCOVERY THAT HAS TAKEN PLACE.

At the second stage of a FLSA collective action, which typically occurs on a defendant's motion to decertify, the court must determine whether the opt-in plaintiffs are, in fact, similarly situated to the representative plaintiff. *Miller*, 2016 WL 4532124, at \*4 (citing *Brabazon v. Aurora Health Care, Inc.*, Case No. 10-CV-714, 2011 WL 1131097, \*2 (E.D. Wis. Mar. 28, 2011). In conducting this second-stage analysis, the court considers three factors: (i) the disparate factual and employment settings of individual plaintiffs; (2) the various individualized defenses available to defendant; and (3) fairness and procedural considerations. *Dekeyser v. Thyssenkrupp Waupaca, Inc.*, 314 F.R.D. 449, 456 (E.D. Wis. 2016). Courts apply this more rigorous standard during the second stage because it occurs after discovery is well-advanced and the court has more information upon which to assess "whether continuing as a collective action will provide efficient resolution in one proceeding of common issues of law and fact." *Id.* (citing *Hoffman-LaRoche*, 493 U.S. at 170).

However, when the parties have engaged in significant discovery before the plaintiff requests conditional certification, as is the case here, a higher standard may be warranted at the conditional certification stage. *Miller*, 2016 WL 4532124, at \*4 (citing *Boelk v. AT&T*

*Teleholdings, Inc.,* Case No. 12-CV-40, 2013 WL 261265, at \*14 (W.D. Wis. Jan. 10, 2013) (noting that it is appropriate to apply more scrutiny at the conditional certification stage where significant discovery has been performed).) Under the heightened standard, the court can "collapse the two stages of the analysis and deny certification outright." *Id.* (internal quotations omitted).

Here, the parties have conducted a significant amount of discovery. The Court has before it relevant portions of testimony provided by WHG's corporate representatives – Jason Westhoff, WHG's former CFO, June Weiss, WHG's Director of Human Resources, and Colleen Zickert, WHG's Payroll Manager. In addition, Meetz attached 48 declarations to his motion. Attached to WHG's opposition to Meetz's motion are six declarations provided by four delivery drivers, June Weiss, and counsel for WHG. Finally, attached to the declaration of June Weiss are WHG's applicable wage and hour policies.

To be clear, WHG contends that Meetz's motion should be denied based on the more lenient, first-stage analysis. However, should the Court disagree, Meetz's request for conditional class certification should still be denied because, on the record before the Court, individual issues predominate in this case.[5]

A.    **Meetz's Individualized Allegations Do Not Support A Collective Action.**

"In determining whether individuals are similarly situated, the court 'need not accept the plaintiff's allegations as true.'" *Ehmann v. Pierce Manufacturing, Inc.*, No. 16-C-247, 2016 WL 5957275, at \*3 (E.D. Wis., October 13, 2016) (citing *Nehmelman v. Penn Nat'l Gaming, Inc.*, 822 F. Supp. 2d 745, 750 (N.D. Ill. 2011)). "Rather, the court evaluates the record before it, including the defendant's oppositional affidavits, to determine whether the plaintiffs are similarly situated to

---

[5] While Defendants argue that class certification should be denied on the current record, should the Court grant the pending Motion for Conditional Class Certification, Defendants reserve the right to both oppose Plaintiff's anticipated Motion for Certification of a Rule 23 Class as well as file a Motion for Decertification of the Conditional Class following the completion of additional discovery.

14

other putative class members." *Nehmelman*, 822 F. Supp. 2d at 751 (internal citations omitted). The variation in the putative class members' wage and reimbursement rates, WHG's reimbursement rate calculations as determined by individual store managers and the location where each putative class member worked must be considered when determining whether the Plaintiffs are similarly situated.

Meetz relies on *Perrin v. Papa John's Intern., Inc.*, for the proposition that dissimilarities in the reimbursement rates and wage payment methodologies cannot be relied upon to defeat class certification; however, *Perrin* is distinguishable from this case. The court in *Perrin* chose not to apply the more rigorous second level of scrutiny to plaintiffs' motion for conditional class certification based, in part, on the determination that the record was not adequately developed. *Perrin,* Case No. 4:09-CV-01335, 2011 WL 4089251, at *3 (E.D. Mo. Sept. 14, 2011). In that case, unlike this, plaintiffs were delivery drivers who were paid only $0.25 more than the minimum wage and the employer did not claim a tip credit. *Id.* at *2. Therefore, it was unnecessary to factor varying tip income as part of the court's analysis of plaintiffs' compensation rate. In their motion for class certification, the *Perrin* plaintiffs alleged a *specific* amount of expenses they incurred which brought their wages below the minimum wage. *Id.* Conversely, the record in this case demonstrates that individual issues predominate. Varying wage rates (some well in excess of the minimum wage), tip income, and reimbursement rates in this case make determining whether an entire class of drivers were subject to a policy that violated the FLSA impossible.

      **1.**    **WHG Delivery Drivers' Responsibilities and Base Wage Rate Vary by Location.**

Here, WHG delivery drivers' responsibilities vary depending upon the store in which they work. (Weiss Decl. ¶¶ 8-9.) Some WHG stores have sit-down restaurants and buffets, while other

stores only offer carry-out or delivery options. (Weiss Decl. ¶ 9.) Delivery drivers at the WHG locations with restaurants spend time serving customers, assisting with the production of food, clearing tables, and assisting with the tasks associated with running a restaurant. (*Id.*) WHG stores without restaurants have delivery drivers assist with taking phone orders and monitoring online orders. (Weiss Decl. ¶ 9.) They may also assist with production and cleaning responsibilities. (*Id.*; Apr. 12, 2017 Decl. of Brendan Conner ("Connor Decl.") ¶ 5; Apr. 12, 2017 Decl. of Jay Westlund ("Westlund Decl.") ¶ 5; Apr. 12, 2017 Decl. of Tyler Golomski ("Golomski Decl.") ¶ 5; Apr. 13, 2017 Decl. of Herb Kauper ("Kauper Decl.") ¶ 5.) Due to size, WHG stores in some rural areas have fewer employees and, as a result, delivery drivers spend more time performing production and other non-tip work. (Weiss Decl. ¶ 11; Connor Decl. ¶ 5.) The percentage of time spent by drivers delivering pizzas greatly impacts their overall compensation and the expenses they incur to drive for WHG.

In-store versus delivery responsibilities come with different base wages. Since 2009, WHG delivery drivers have been paid a base pay rate of between $5.25 per hour and $9.25 per hour for all time spent delivering pizzas. (Weiss Dep. at 47:21-48:5, 61:2-8, 63:23-25, 64:1-25, 65:1-25; Westhoff Dep. at 24:1-3, 16-22.) Delivery drivers are also paid between $7.25 per hour and $9.25 per hour for time spent performing non-delivery work. (Weiss Dep. at 70:2-10.) The base rates of pay are determined on a store-by-store basis. (Weiss Dep. at 47:21-48:5, 61:2-8, 63:23-25, 64:1-25, 65:1-25; Westhoff Dep. at 24:1-3, 16-22.) For example, WHG paid Midtown delivery drivers $9.25 an hour for all work they performed, both delivery and non-delivery. (Weiss Dep. at 66:12-20.) The higher rate was based on multiple factors, including the high demand for drivers in the area and competition for labor. (Weiss Dep. at 63:1-25.) As a result, determining whether a

16

delivery driver was paid below the minimum wage as a result of his or her incurred vehicle expenses will require an individual analysis as drivers' base wages varied.

  **2.**  **WHG's Vehicle Reimbursement Policy Varies By Location.**

  WHG set a $1.00 minimum reimbursement rate for its stores based on its analysis of delivery drivers' expenses. And, of course, reimbursement rates have changed depending upon the size of the delivery area covered and the market for delivery drivers in the cities where WHG operates. For example, the Pizza Hut store located at Midtown in Milwaukee paid delivery drivers between $1.25 and $1.90 per delivery to reimburse their vehicle expenses. (Weiss Decl. ¶ 17.) Delivery drivers at the Farwell location in Milwaukee are paid a reimbursement rate of $1.90 per delivery. (Weiss Decl. ¶ 18.) In certain rural areas, Pizza Hut has increased the reimbursement rate to $2.00 per delivery. (Weiss Dep. at 107:18-25.)

  In addition, managers can and will independently raise the reimbursement rates paid to delivery drivers. (Weiss Dep. at 108:2-20.) This variation in reimbursement approach is illustrated by the declarations Meetz offers in support of his motion. Those declarations cite at least seven different reimbursement rates being paid. (Feb. 6, 2017 Decl. of Joseph Edwards ("Edwards Decl.") ¶ 11 ($1.25 reimbursement rate); Feb. 1, 2017 Decl. of Shawna Krchma ("Krchma Decl.") ¶ 11 ($1.90 reimbursement rate); Feb. 20, 2017 Decl. of William Preus ¶ 11 (listing $1.00, $1.00-$2.00, $1.00-2.50 reimbursement rates depending upon store and location of delivery); Feb. 21, 2017 Decl. of Joshua Jansen ¶ 11 ($1.10 reimbursement rate); Jan. 25, 2017 Decl. of Dominic Holley ¶ 11 ($1.00-$2.00 reimbursement rate); Feb. 10, 2017 Decl. of Sean

Miller ¶ 11 ($0.50 reimbursement rate); Feb. 18, 2017 Decl. of Steven Hadler ¶ 11 ($0.75 reimbursement rate).)[6]

### 3. Delivery Frequency and Distance Varies By Location.

Depending on the location where the putative class members worked, both the size of the delivery area and the number of deliveries made per Run varied significantly. For example, Joseph Edwards, an individual who worked for Pizza Hut's Milwaukee Midtown location for less than a month, claims that he drove 5-6 miles per delivery and made approximately 10 deliveries per shift. (Edwards Decl. ¶¶ 2-3, 12-13.) The Midtown location served an area extending up to a maximum of 3.1 miles from the Pizza Hut store. (Weiss Decl. ¶ 17.) Mr. Edwards states in his declaration that he was paid $12.50 toward vehicle expenses for each day he worked. (Edwards Decl. ¶¶ 11, 13 ($1.25 per delivery multiplied by 10 deliveries per shift).) Conversely, Shawna Krchma claims she worked at the Farwell location and averaged 3 to 4 miles per delivery, with 18-22 deliveries per shift, and was paid $41.80 to reimburse her for her expenses each day she worked. (Krchma Decl. ¶¶ 2-3, 11-13.) The Farwell location serves an area extending up to a maximum of 2.69 miles from the Pizza Hut store. (Weiss Decl. ¶ 18.) Finally, Billy Davis, who worked for WHG for two weeks in 2015, alleges that he drove up to 23 miles, twelve times every shift that he worked from the Tomahawk, Wisconsin location, which serves an area extending up to a maximum of 6.87 miles from the Pizza Hut store. (Feb. 10, 2017 Decl. of Billy Davis ¶¶ 2-3, 11-13; Weiss Decl. ¶ 18.) These declarations fail to explain the number of deliveries they made per Run and the average distance each Run covered.

---

[6] According to WHG's records, all WHG employees were reimbursed at a rate of at least $1.00 per delivery and allegations to the contrary included in the declarations submitted to the Court are unsupported by WHG's records. (Weiss Decl. ¶ 20.)

#### 4. Each Plaintiff's Claimed Expenses Will Vary Depending Upon Driving History, Location, Vehicle Driven And Personal Use Of The Vehicle.

Meetz alleges that the putative class members' individual expenses exceeded the reimbursement rate paid by WHG. Notably, only expenses incurred for the primary benefit of WHG need be reimbursed. *Wass v. NPC Int'l, Inc.*, 688 F. Supp. 2d 1282, 1286 (D. Kan. 2010) ("[U]nder [29 C.F.R.] Section 778.217 of the regulations, an employer may reasonably approximate the amount of expenses in reimbursing an employee for expenses incurred for the benefit of the employer…" and noting 29 C.F.R. Section 778.217 is applicable to minimum wage calculations.) Meetz's discovery responses indicate that he may be attributing costs and expenses that cannot reasonably be tied to the work performed for WHG. For example, Meetz cites the cost of a broken axle as a cost that should have been included in the rate of reimbursement – a vehicle expense unlikely to be connected primarily to his delivery of pizza for WHG. (*See, e.g.,* Meetz Decl. ¶ 9.)

In addition, Meetz appears to rely on insurance and depreciation costs to allege plaintiffs were not properly reimbursed. *Id.* However, such expenses vary greatly based on a host of factors, including an individual's personal use of the vehicle, whether relatives are also insured on the same plan, whether the vehicle is used for other purposes, and whether the vehicle is taken out of service due to some unforeseen circumstance, such as a non-work related accident.[7] The expenses cited by the declarants will necessarily require the Court to make individualized inquiries to resolve whether plaintiffs' expenses were properly included in their cost analysis.

Finally, each purported class member drove a different vehicle with a unique vehicle history, and incurred and defrayed different maintenance costs. Plaintiffs have not alleged that

they drove similar cars or similarly cared for their vehicles. The declaration offered by Meetz do contain boilerplate language that each declarant "incurred vehicle expenses including fuel, oil changes, drive shaft, brakes/pads, axel [sic], tires, tire rotations, batteries, insurance, registration, and other items …." That boilerplate language fails to satisfy Meetz's burden to show that the expenses incurred by delivery drivers were uniform during the class period.

In sum, the record demonstrates that the putative class members in this action were subject to disparate employment terms that will impact whether individual claims can succeed. Individual issues predominate, such as significant variation in the opt-in plaintiffs' compensation, reimbursement rates, and employment duties. Therefore, Meetz's motion should be denied.

**B.      WHG Has Various Individualized Defenses.**

WHG's ability to defend against the allegations in this action necessarily requires an individualized inquiry into each putative class member's particular circumstances and actions. WHG's defense to a wage and hour claim is dependent on an individualized analysis of each driver's base wage, tips reported, reimbursements paid, and vehicle costs incurred while at work. Moreover, to the extent individual class members did not adequately or properly report tip income, such failures will impact both their claim and WHG's defenses. Because individual defenses exist, Meetz's motion for conditional class certification should be denied.

**C.      Fairness and Procedural Considerations Make A Collective Action Improper.**

"[I]t is incumbent on a court at the conditional-certification stage to review all the evidence before it to determine whether it should facilitate notice and thereby expand the scope of litigation." *Saleen v. Waste Mgmt., Inc.*, Case No. 08-4959, 2009 WL 1664451, at *8 (D. Minn.

---

[7] *See, e.g.*, http://www.4autoinsurancequote.com/learning-center/vehicle-depreciation-and-its-effect-on-insurance-rates/. ("The total value depreciation your vehicle sees on an annual basis will be determined by a whole host of factors, including the vehicle's make, model and brand, how many instances of that make have required repairs or had recalls issued, failure rates over the long term, and more.")

June 15, 2009), aff'd, 649 F. Supp. 2d 937 (D. Minn. 2009).  Were such a complete review avoided, as Meetz requests in his motion, the Court "would abandon its duty to determine whether the matter before it is an appropriate case for collective treatment." *Id*.

The Court should not expand this case and facilitate notice to thousands of individuals when Meetz has not demonstrated that these issues can be fairly adjudicated on a collective basis. *Id.*, at *28-30 (denying motion for conditional certification because plaintiffs failed to show that the case is "manageable as a collective action").  Allowing such an action to proceed would waste resources and unfairly prejudice WHG which has already incurred significant defense costs in this matter. *Gromek v. Big Lots, Inc.*, No. 10 C 4070, 2010 WL 5313792, at *5 (N.D. Ill. Dec. 17, 2010) (denying conditional certification where the claims were not manageable); *Freeman*, 256 F. Supp. 2d at 945 (noting it "would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated").

Given that individual WHG stores set distinct wage and reimbursement rates, the Court will be required to supervise mini-trials to determine whether WHG violated the FLSA by maintaining reimbursement policies that resulted in delivery drivers being paid less than the minimum wage.  Such a case is not appropriate for collective action.

**III.  THIS COURT SHOULD DEFER RULING ON THE FORM OF NOTICE UNTIL AFTER THE PARTIES MEET AND CONFER ABOUT THE ISSUE.**

For all the reasons stated above, WHG respectfully requests that Meetz's motion be denied. However, should the Court grant the motion, WHG requests time to meet and confer with Plaintiffs' counsel regarding the form of Meetz's proposed notice.  The proposed notice mischaracterizes the basis of this lawsuit by stating in Section I that Defendants failed to reimburse the putative class members for their vehicle expenses.  Again, Meetz has failed to even make a

Case 1:16-cv-01313-WCG   Filed 04/14/17   Page 21 of 23   Document 99

modest showing that that is the case. Moreover, the basis of Plaintiffs' claims is that WHG failed to pay delivery drivers the minimum wage, not that they were insufficiently reimbursed. The notice also fails to appropriately characterize WHG's defense that it reasonably approximated delivery drivers' expenses and delivery drivers received at least the minimum wage for every hour worked when factoring in a driver's base wage, tips and reimbursements. Finally, the notice fails to inform the putative class members that they will be bound by any negative outcome of the litigation.

In addition, a notice period of 75 days is excessive and unnecessary. Plaintiffs have already widely publicized this lawsuit through their website and plaintiffs' counsel presumably spent the last three months directly contacting putative class members following WHG's January 6, 2017 disclosure of all of the delivery drivers who have worked for WHG since September 30, 2013. If granted conditional certification, the duration of the notice period should not extend beyond 45 days, which is consistent with FLSA practice. *See Miller v. Thedacare, Inc.*, No. 15-C-506, 2016 WL 4532124 (E.D. Wis. Aug. 29, 2016); see also *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 451-52 (S.D.N.Y. 2011) (limiting opt-in period).

Accordingly, if the Court grants conditional certification, WHG respectfully requests that the parties be given a period of two weeks from the date of the order to meet and confer regarding the content and terms of the notice. Courts routinely allow the parties an opportunity to meet and confer about these issues. *See Mark v. Gawker Media, LLC*, No. 13-CV-4347 AJN, 2014 WL 5557489, at *1 (S.D.N.Y. Nov. 3, 2014) (granting defendant's request to meet and confer with plaintiffs regarding the proposed notice); *see also Bradford v. Logan's Roadhouse, Inc.,* 137 F.3d 1064, 1080 (M.D. Tenn. 2015) (ordering parties to meet and confer regarding the proposed notice).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that Plaintiffs' Motion for

Conditional Certification be denied in its entirety.

Dated:  April 14, 2017

By:  *s/Brian C. Spahn*
Brian C. Spahn (#1060080)
*Attorneys for Defendants, Wisconsin*
*Hospitality Group, LLC and PH Hospitality*
*Group, LLC d/b/a Pizza Hut*
Rebeca M. Lopez (#1084842)
Godfrey & Kahn, S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202-5615
Phone: 414-273-3500
Fax:   414-273-5198
Email: bspahn@gklaw.com
        rlopez@gklaw.com

Josh Johanningmeier (#1041135*)*
Godfrey & Kahn, S.C.
One East Main Street, Suite 500
Madison, WI 53703
Phone:  608-257-3911
Fax:    608-257-0609
Email:  jjohanningmeier@gklaw.com